| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**SOUTHERN DISTRICT OF NEW YORK** | **FOR PUBLICATION** |

---------------------------------------------------------------:
:   Chapter 11
In re    :
:   Case No. 08-13555 (JMP)
LEHMAN BROTHERS HOLDINGS INC., et al.,   :
:   (Jointly Administered)
       Debtors.   :
:
---------------------------------------------------------------:
:
LEHMAN BROTHERS SPECIAL FINANCING   :
INC.,   :   Adversary Proceeding
:
       Plaintiff,   :   No. 09-01032 (JMP)
-against-   :
:
BALLYROCK ABS CDO 2007-1 LIMITED, and   :
WELLS FARGO BANK, N.A., TRUSTEE,   :
:
       Defendants.   :
---------------------------------------------------------------:

**MEMORANDUM DECISION GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS BY DEFENDANT BALLYROCK ABS CDO 2007-1 LIMITED**

WEIL, GOTSHAL & MANGES, LLP
*Attorneys for Debtors*
767 Fifth Avenue
New York, New York 10153

    Ralph I. Miller, Esq.
    Richard W. Slack, Esq.

ORRICK, HERRINGTON & SUTCLIFFE LLP
*Attorneys for Ballyrock ABS CDO 2007-1 Limited*
51 West 52nd Street
New York, New York 10019

    Steven J. Fink, Esq.
    Robert L. Sills, Esq.

LOCKE LORD BISSELL & LIDDELL LLP
*Attorneys for Wells Fargo Bank, N.A., Trustee*
3 World Financial Center
New York, New York 10281

    Casey B. Howard, Esq.
    Joseph N. Froehlich, Esq.

QUINN EMANUEL URQUHART & SULLIVAN, LLP
*Attorneys for the Official Committee of Unsecured Creditors*
865 S. Figueroa Street
10th Floor
Los Angeles, California 90017

    Eric D. Winston, Esq.

SIDLEY AUSTIN LLP
*Attorneys for BlackRock Mortgage Investors Master*
*Fund, L.P. and Long Hill 2006-1, Ltd.*
787 Seventh Avenue
New York, New York 10019

    Nicholas P. Crowell, Esq.
    Alex J. Kaplan, Esq.
    Alex R. Rovira, Esq.

SULLIVAN & CROMWELL LLP
*Attorneys for Barclays Bank PLC and Long*
*Island International Limited*
125 Broad Street
New York, New York 10004

    Robinson B. Lacy, Esq.

*Introduction*

This decision addresses a motion to dismiss filed by defendant Ballyrock ABS CDO 2007-1 Limited ("Ballyrock") in an adversary proceeding commenced by Lehman Brothers Special Financing Inc. ("LBSF") -- *Lehman Bros. Special Fin. Inc. v. Ballyrock ABS CDO 2007-1 Ltd. et al.* (Adv. Pro. No. 09-01032) (the "Adversary Proceeding").

The Adversary Proceeding raises questions relating to the enforceability in bankruptcy of a contractual provision triggered by the default and early termination of certain transactions under a swap agreement between LBSF and Ballyrock.[1]  Ballyrock took steps to terminate the swap due to the default that occurred when Lehman Brothers Holdings Inc. ("LBHI") filed a petition under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

At the time of termination, LBSF was in the money and entitled to a termination payment based on the cost of replacing each terminated transaction.  Notably, the swap agreement contains a provision that effectively would deprive LBSF of its right to collect the termination payment on account of LBHI's bankruptcy.  Thus, the motion to dismiss raises a controlling legal issue -- *i.e.*, whether a provision in the documentation that

---

[1] The documentation of the swap agreement at issue follows a standard format.  Ballyrock entered into an International Swaps and Derivatives Association ("ISDA") master agreement with LBSF.  This master agreement, along with a schedule and any confirmations, governed the individual swap transactions between the parties.

3

adversely impacts a debtor's right to property upon the filing of a chapter 11 petition may constitute an unenforceable *ipso facto* clause.

As discussed below, the contractual provision at issue appears to function as an unenforceable *ipso facto* clause that deprives LBSF of the benefit of its in-the-money position as a direct consequence of the commencement of a bankruptcy case by LBHI. For this reason, the LBSF complaint against Ballyrock (the "Complaint") states a claim upon which relief may be granted and will survive the motion to dismiss. As explained below, another count in the Complaint challenging the effectiveness of steps taken to terminate the swap is being dismissed.

### *Relevant Facts and Procedural History*

On July 12, 2007, LBSF and Ballyrock entered into an ISDA master agreement.[2] The Ballyrock Master Agreement was modified and supplemented by a schedule (the "Schedule"), which included a guarantee from LBHI and a Credit Support Annex designating LBHI as a "Credit Support Provider" to LBSF.[3]

Ballyrock, in turn, entered into an indenture with Wells Fargo Bank, N.A. (the "Trustee") on July 12, 2007.[4] Pursuant to the Indenture, Ballyrock issued several classes of notes to investors.[5] The Indenture requires that all disbursements by the Trustee be

---

[2] Declaration of Steven J. Fink, dated Mar. 31, 2009, ECF No. 15 (hereinafter the "Fink Decl."), Ex. A (ISDA Master Agreement, dated July 12, 2007, between LBSF and Ballyrock (the "Ballyrock Master Agreement").

[3] Fink Decl. Ex. B (Schedule) Pt. 4(g); Ex. C (Guarantee of LBHI); Ex. D (Credit Support Annex).

[4] Fink Decl. Ex. F (Indenture, dated July 12, 2007) (hereinafter, the "Indenture").

[5] The holders of all but the Subordinated Notes, as defined in the Indenture, are referred to herein as the "Senior Noteholders." The largest Senior Noteholders are Barclays Bank PLC, Long Island International Limited, BlackRock Mortgage Investors Master Fund, L.P., and Long Hill 2006-1, Ltd. These parties are the beneficial owners of approximately $145 million of Ballyrock's senior notes, and have taken the lead role as defendants in this Adversary Proceeding. *See* Mem. of Law in Further Support of the Mot. to

4

made in conformity with a specified priority of payments (the "Waterfall").[6] The Waterfall requires payment in full to the holders of higher priority notes before any distributions may be made to holders of notes with a lower priority.

The Ballyrock Master Agreement and Indenture thus established the terms that governed the transactions entered into between Ballyrock and LBSF (each a "Transaction" and together the "Transactions").[7] Under these Transactions, LBSF purchased, and Ballyrock sold, loss protection with respect to collateralized debt reference obligations and mortgage-backed securities.[8]

The Ballyrock Master Agreement specifies several "Events of Default," including the bankruptcy of a party or Credit Support Provider:

> **Events of Default**. The occurrence at any time with respect to a party [LBSF or Ballyrock] or, if applicable, any Credit Support Provider [LBHI] of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party: … (vii) **Bankruptcy**. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party: - … (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights …

---

Dismiss the Complaint, dated June 17, 2009, ECF No. 30, at 1; Transcript of Hearing, dated Sept. 17, 2009, Case No. 08-13555, ECF No. 5262 ("Hearing Tr."), 62:14-18.

[6] *See* Fink Decl. Ex. F (Indenture) § 11.1. The Indenture contains two payment priority waterfalls: Section 11.1(a) provides for the distribution of interest proceeds and section 11.1(b) addresses the distribution of principal proceeds. The Court will limit its discussion to section 11.1(a) because the first distribution in section 11.1(b) is "to the payment of the amounts referred to in clauses (i) through (viii) under section 11.1(a)" and all the assets will be distributed within these initial clauses.

[7] *See* Fink Decl. Ex. A (Ballyrock Master Agreement) at 1 (prefatory clause) (LBSF and Ballyrock "anticipate entering into one or more transactions … that are or will be governed by this Master Agreement …")

[8] *See* Fink Decl. Ex. E (Confirmation for CDO Securities and Confirmation for CMBS/RMBS Securities).

5

Fink Decl. Ex. A (Ballyrock Master Agreement) § 5(a).

Upon the occurrence of an Event of Default, the non-defaulting party may designate an "Early Termination Date:"

> **Right to Terminate Following Event of Default.** If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may … designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions …

Fink Decl. Ex. A. (Ballyrock Master Agreement) § 6(a).

The Ballyrock Master Agreement further provides that, upon the designation of an Early Termination Date, the party that is the out-of-the-money party shall make a termination payment to the party that is in the money. *See* Fink Decl. Ex. A (Ballyrock Master Agreement) §§ 6(d), (e). The parties agreed that any termination payment would be calculated using a recognized industry methodology referred to as the "Second Method," which calls for payment to the in-the-money counterparty regardless of whether it was also the defaulting party.[9]

With limited exceptions, an unpaid termination payment is given a high priority within the Waterfall and ordinarily would be paid before any distributions are made to the Senior Noteholders.[10] One specified category of termination payment, however, a "Defaulted Synthetic Termination Payment," is singled out for particularly harsh

---

[9] Fink Decl. Ex. B (Schedule) Pt. 1(e). Within the derivatives industry the "First Method" and "Second Method" are well-understood terms of art that describe the calculation and payment of termination payments. Under the First Method, a defaulting but in-the-money party is not entitled to any termination payment. The Second Method yields the opposite result and provides for an early termination payment to be made to the in-the-money party regardless of whether that party is in default.

[10] *See* Fink Decl. Ex. F (Indenture) § 11.1(a).

treatment under the Waterfall. A termination payment arising as a result of a default by LBSF or LBHI is defined as a "Defaulted Synthetic Termination Payment"[11] and is excluded from the high priority afforded to other unpaid termination payments,[12] subordinated to the Senior Noteholders, and capped in the amount of $30,000.[13] Therefore, a termination payment due to LBSF can rank as high as the third-priority position or drop precipitously in rank to nineteenth place in the Waterfall if LBSF is the defaulting party.

The material shift in priority of this termination payment is at the core of the dispute between LBSF and Ballyrock. The right to receive payment of the remaining $137 million from Ballyrock depends on the determination of whether LBSF is entitled to a high-priority termination payment or a deeply subordinated and capped Defaulted Synthetic Termination Payment (The provisions in the Indenture describing the subordinated Defaulted Synthetic Termination Payment are defined for purposes of this decision as the "Defaulted Synthetic Termination Payment Clause").

Following the bankruptcy of LBHI on September 15, 2008, Ballyrock gave notice to LBSF that LBHI's bankruptcy filing constituted an Event of Default and designated September 16, 2008 as the Early Termination Date in respect of all outstanding

---

[11] *See* Fink Decl. Ex. F (Indenture) § 1.1 (defining "Defaulted Synthetic Termination Payments" to mean "any termination payment … payable by the Issuer [Ballyrock] … as a result of an 'Event of Default' … as to which [LBSF or LBHI] is the 'Defaulting Party'").

[12] *Id.* § 11.1(a)(iii) (providing that the third position in the Waterfall is the payment "of any unpaid termination payment (***excluding any Defaulted Synthetic Termination Payment***) payable by the Issuer in connection with the termination in full of the Credit Default Swap Agreement …") (emphasis added).

[13] Fink Decl. Ex. F (Indenture) § 11.1(a)(xix) (The nineteenth position in the Waterfall provides for "the payment of … (b) any Defaulted Synthetic Termination Payment; provided, that such payment shall not exceed $30,000 on any Quarterly Distribution Date").

Transactions under the Ballyrock Master Agreement.[14] The Trustee then gave notice that Ballyrock owed LBSF a termination payment of approximately $404 million.[15] Thereafter, Ballyrock liquidated its assets, generating approximately $326 million. On November 6, 2008, the Trustee disbursed approximately $189 million of this amount to the Senior Noteholders pursuant to the payment priority scheme of the Waterfall. The Trustee also announced its intent to distribute the remaining $137 million to the Senior Noteholders on the next scheduled distribution date (the "<u>Proposed Distribution</u>").[16]

In response to the Trustee's announcement of the Proposed Distribution, LBSF filed the Complaint against Ballyrock on February 3, 2009 seeking (i) a declaratory judgment that the Proposed Distribution would violate applicable New York and bankruptcy law; (ii) a declaratory judgment that the termination of the Credit Default Swap Agreement (as defined in the Complaint) was improper; and (iii) a temporary restraining order and permanent injunction enjoining the Trustee from disbursing any of the remaining $137 million to any party other than LBSF.

Ballyrock, with the support of the Senior Noteholders, moved to dismiss the Complaint.[17] The issues were fully briefed,[18] and the Court heard oral argument on the

---

[14] Declaration of Robinson B. Lacy, dated June 17, 2009, ECF No. 33 (the "<u>Lacy Decl.</u>"), Ex. A (Notice of Event of Default and Designation of Early Termination Date) (hereinafter, the "<u>September 16 Letter</u>").

[15] Complaint ¶ 20. Notably, Ballyrock "does not dispute the obligation to pay the early termination amount calculated in connection with the bankruptcy of LBHI pursuant to the Second Method." Ballyrock's Mem. in Supp. of Mot. to Dismiss, dated Mar. 31, 2009, ECF No. 14, at 6 n.7. However, it asserts that "the parties agreed that such obligation would be applied in accordance with the priority of payments specified in the Indenture" and that LBSF's termination payment is a subordinated Defaulted Synthetic Termination Payment that can only be paid after all higher priority items in the Waterfall are paid in full. *Id*.

[16] Complaint ¶¶ 20-25.

[17] *See* Ballyrock Mot. to Dismiss Complaint, dated Mar. 31, 2009, ECF No. 13; Mem. of Law of Barclays Bank PLC, Long Island International Limited, BlackRock Mortgage Investors Master Fund, L.P., and Long Hill 2006-1, Ltd. in Further Supp. of Ballyrock Mot. to Dismiss, dated June 17, 2009, ECF No. 30.

8

motion to dismiss and reserved decision. While the matters raised in the motion to dismiss have been under advisement, the parties engaged in discussions in an effort to resolve their disputes regarding the Proposed Distribution. The Court has been informed that these discussions, despite substantial efforts, failed to produce a settlement.

### *Rule 12(b)(6) Standard*

Federal Rule of Bankruptcy Procedure 7012(b), which incorporates Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"), permits a bankruptcy court to dismiss an adversary proceeding if a plaintiff's complaint fails to state a claim upon which relief can be granted. In reviewing a motion to dismiss under Rule 12(b)(6), the Court accepts the factual allegations of the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007); *E.E.O.C. v. Staten Island Sav. Bank*, 207 F.3d 144, 148 (2d Cir. 2000). To survive a challenge to the adequacy of a complaint under Rule 12(b)(6), the factual allegations in a complaint need to be supported by more than merely conclusory statements. *Twombly*, 550 U.S. at 555. The allegations must be sufficient "to raise a right to relief above the speculative level," and provide more than a "formulaic recitation of the elements of a cause of action." *Id.* In other words, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 129 S. Ct. at 1950.

In ruling on a motion to dismiss, the Court may consider documents omitted from the plaintiff's complaint but attached by a defendant to its motion to dismiss. *See, e.g.,*

---

[18] The Official Committee of Unsecured Creditors intervened in the Adversary Proceeding and joined LBSF in its opposition to Ballyrock's motion to dismiss. *See* Creditors' Committee's Joinder in Plaintiff LBSF's Resp. in Opp'n to Ballyrock's Mot. to Dismiss, dated July 21, 2009, ECF No. 38.

9

*Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d. Cir. 1991) (district court may consider exhibits omitted from plaintiff's complaint but attached as exhibits to defendant's motion papers because "there was undisputed notice to plaintiffs of their content and they were integral to plaintiffs' claim").

## *Discussion*

The Court is denying the motion to dismiss in relation to the two counts that, respectively, seek to invalidate the Defaulted Synthetic Termination Payment Clause as an *ipso facto* clause or to enjoin the Proposed Distribution but is granting the motion as to count II of the Complaint alleging that ineffective steps were taken to terminate the Credit Default Swap Agreement. Consequently, the surviving counts are counts I ("Declaratory Judgment – The Proposed Distribution is Improper") and III ("Request for Temporary Restraining Order and Preliminary and Permanent Injunction Pursuant to Bankruptcy Rules 7001(7) and 7065 and Bankruptcy Code § 105(a)") of the Complaint. The following sections set forth the reasons for this decision.

A. *The Complaint asserts viable claims that the Defaulted Synthetic Termination Payment Clause violates the Bankruptcy Code's prohibition against ipso facto clauses*

The Complaint alleges that the provisions governing a Defaulted Synthetic Termination Payment are invalid, and for that reason it would not be proper to make the Proposed Distribution.[19] LBSF characterizes this clause as an invalid penalty, forfeiture, and *ipso facto* clause.[20] In a decision in another adversary proceeding last year in relation to a similar subject matter, the Court invalidated the operation of a so-called "flip" clause

---

[19] Complaint ¶¶ 26-39, 51-54.

[20] Complaint ¶¶ 27, 32, 36.

10

such as the one now before the Court. That decision – identified below as the *Perpetual* decision – is directly applicable to this Adversary Proceeding. On the basis of the Court's reasoning in *Perpetual*, the Complaint states claims on which relief may be granted that provisions purporting to alter distribution rights and priorities to the detriment of LBSF may be unenforceable because they function as *ipso facto* clauses.[21]

In the Complaint, LBSF contends that the Defaulted Synthetic Termination Payment Clause is unenforceable as an *ipso facto* clause because it modifies LBSF's right to a high-priority termination payment as a consequence of the commencement of a bankruptcy case.[22] Accordingly, LBSF alleges that Ballyrock lacks the contractual authority to make the Proposed Distribution of $137 million to the Senior Noteholders before first paying LBSF.[23] These allegations are sufficient to state a claim under the authority of the Court's decision in *Lehman Bros. Special Fin. Inc. v. BNY Corporate Tr. Servs. (In re Lehman Bros. Holdings Inc.)*, 422 B.R. 407 (Bankr. S.D.N.Y. 2010) ("*Perpetual*").

---

[21] Given the determination that the count states a plausible claim based on the *ipso facto* clause, it is not necessary for the Court to rule on LBSF's other contentions that the clause should not be enforceable under the alternative theories that it constitutes an invalid penalty or forfeiture. For the sake of clarity and completeness, however, the Court notes that it is difficult to characterize the Defaulted Synthetic Termination Payment Clause as either a penalty or a forfeiture. The clause does not appear to be an impermissible penalty because it does not fix damages, but instead eliminates the right to receive funds that would have been distributed to LBSF absent a default. *See Drexel Burnham Lambert Prod. Corp. v. Midland Bank PLC,* 1992 U.S. Dist. LEXIS 21223, at *4 (S.D.N.Y. Nov. 9, 1992) (holding a payment provision in swap agreement that eliminated an early termination payment due to be made to the defaulting party was "neither a penalty, a forfeiture, nor an unjust enrichment" because it merely "required Drexel GSI to forego an unrealized investment gain"). The clause is also clearly worded and free from doubt as to its meaning. It appears likely, as a result, that the clause would not be deemed to constitute an impermissible forfeiture provision in light of its clarity and the sophistication of the parties. *See Kreiss v. McCown de Leeuw & Co.,* 131 F.Supp.2d 428, 436 (S.D.N.Y. 2001) (holding a repurchase agreement valid and not a forfeiture under New York law, even though it operated to deprive counterparties of valuable options, because the agreement was unambiguous).

[22] *See* Complaint ¶¶ 26-32.

[23] *Id.*

11

"The Bankruptcy Code of 1978 effected a change in the treatment of contract or lease clauses that" sought to "modify the relationships of contracting parties due to the filing of a bankruptcy petition" -- so-called *ipso facto* clauses. *Reloeb Co. v. LTV Corp. (In re Chateaugay Corp.),* 1993 U.S. Dist. LEXIS 6130, *14 (S.D.N.Y. 1993). It is now axiomatic that *ipso facto* clauses are unenforceable in bankruptcy. *See, e.g., id.* at *15-*16 (explaining that Bankruptcy Code "section 365 abrogates the power of *ipso facto* clauses" and, therefore, "[n]o default may occur pursuant to an *ipso facto* clause"). Under Bankruptcy Code section 365(e):

> an executory contract … may not be terminated or modified, and any right or obligation under such contract … may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract … that is conditioned on … the commencement of a case under this title … .

11 U.S.C. § 365(e)(1).

Bankruptcy Code section 541, in addition to describing what constitutes property of the bankruptcy estate, also invalidates *ipso facto* clauses, providing that a debtor's interest in property:

> becomes property of the estate … notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law … that is conditioned on … the commencement of a case under this title … and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property.

11 U.S.C. § 541(c)(1)(B).

Consistent with the holding in *Perpetual*, these sections are broadly worded and protect a debtor from the operation of a clause triggered by not only its own bankruptcy

12

filing but also by the bankruptcy of a related entity.[24] This is so because each of these sections prohibits modification of a debtor's right solely because of a provision in an agreement conditioned upon "the commencement of *a case* under this title." 11 U.S.C. §§ 365(e)(1), 541(c)(1)(B) (emphasis added). Importantly, the language used is not limited to the commencement of a case *by or against the debtor*. In *Perpetual*, the Court applied the language of these sections of the Bankruptcy Code to the situation presented by the sequential filings of the LBHI and LBSF bankruptcy cases, concluding that LBHI's commencement of a case on September 15, 2008 was the first in a series of related bankruptcy cases that included the commencement of a case by LBSF on October 3, 2008.[25]

This analysis from the *Perpetual* decision would render ineffective the changes in the Waterfall that would result from activation of the Defaulted Synthetic Termination Payment Clause. Thus, the Complaint brought by LBSF is sufficient to state claims against Ballyrock based on the allegations that the clause in question constitutes an unenforceable *ipso facto* provision that may not be enforced to deprive LBSF of rights on account of the chapter 11 filing of LBHI.

### B.    *The Defaulted Synthetic Termination Payment Clause is not subject to any applicable safe harbor provision*

The safe harbor provisions of Section 560 of the Bankruptcy Code were enacted to protect a non-defaulting swap participant's contractual rights to:  (i) liquidate,

---

[24] *Perpetual,* 422 B.R. at 420.

[25] *Perpetual,* 422 B.R. at 420 ("Regardless of how this language may be interpreted in other settings, the Court is convinced that the chapter 11 cases of LBHI and its affiliates is a singular event for purposes of interpreting this *ipso facto* language … LBHI commenced a case that entitled LBSF, consistent with the statutory language, fairly read, to claim the protections of the *ipso facto* provisions of the Bankruptcy Code …").

13

terminate or accelerate "one or more swap agreements because of a condition of the kind specified in section 365(e)(1)" of the Bankruptcy Code or (ii) "offset or net out any termination values or payment amounts arising under or in connection with the termination, liquidation, or acceleration of one or more swap agreements..." 11 U.S.C. § 560.

Courts have refrained from interpreting the language of section 560 beyond the plain meaning of the words "liquidation, termination, or acceleration". *See Calpine Energy Servs, L.P. v. Reliant Energy Elec. Solutions, LLC, (In re Calpine Corp.)*, 2009 WL 1578282, at *6-*7 (Bankr. S.D.N.Y. 2009) (narrowly construing section 556 of the Bankruptcy Code because the provision, "by its terms, clearly limits its reach to only those clauses that trigger termination upon the occurrence of a condition specified in section 365(e)(1) of the Code").

The operative language of the Defaulted Synthetic Termination Payment Clause does not fall within the safe harbor protections of section 560. As alleged in the Complaint, this clause operates to deprive LBSF of valuable property rights upon designation by the non-debtor counterparty of an Early Termination Date. The provisions governing a Defaulted Synthetic Termination Payment purport to substantially lower the priority of payment within the Waterfall, thereby effectively nullifying any entitlement of LBSF to a termination payment that would have been payable were it not for the bankruptcy filing of LBHI.[26]

---

[26] *See* Lacy Decl. Ex. B, (September 16, 2008 Letter to Ballyrock Investors) (indicating the Event of Default was "Lehman Holdings' bankruptcy filing" resulting in a Defaulted Synthetic Termination Payment); Fink Decl. Ex. F (Indenture) §§11.1(a)(iii), 11.1(a)(xix).

14

Accordingly, the Defaulted Synthetic Termination Payment Clause, once activated by the default of a bankruptcy filing, would change the flow of funds in a manner that would deprive LBSF of pre-existing distribution rights. Such a mandated elimination of a substantive right to receive funds that existed prior to the bankruptcy of LBHI should not be entitled to any protection under safe harbor provisions that, by their express terms, are limited exclusively to preserving the right to liquidate, terminate and accelerate a qualifying financial contract.

### C.    *Dismissal of Count II Of The Complaint*

Count II of the Complaint seeks a declaratory judgment that Ballyrock improperly terminated the Credit Default Swap Agreement,[27] and, as a result, both that agreement and the underlying Transactions remain in effect. This count is premised on the allegation that the Credit Default Swap Agreement, by custom and practice of the market, includes <u>both</u> the Ballyrock Master Agreement and the Transactions thereunder.

LBSF contends that Ballyrock was unable to terminate the Credit Default Swap Agreement without first satisfying certain prerequisites described in the Indenture. Specifically, LBSF argues that section 7.8(a)(xi) of the Indenture prohibits Ballyrock from "terminat[ing] the Credit Default Swap Agreement unless (A) no Transactions remain outstanding … or (B) [Ballyrock] has entered into a replacement" swap agreement.[28] LBSF claims these conditions to termination were not met when Ballyrock

---

[27] The Complaint defines "Credit Default Swap Agreement" very generally. It provides: "[LBSF] and Ballyrock entered into a contract, known as a credit default swap, pursuant to which Ballyrock, a special purpose entity formed solely for this transaction, agreed to pay [LBSF] if losses were incurred on certain underlying assets ('<u>Credit Default Swap Agreement</u>')." Complaint ¶ 1 (emphasis in original). This definition makes no distinction between the Ballyrock Master Agreement and the underlying Transactions.

[28] Complaint ¶¶ 42-50.

15

sent the September 16 Letter purporting to terminate the outstanding Transactions and, accordingly, that the agreement and the Transactions remain in effect despite the purported termination.[29]

This proposed interpretation of the governing documents is unpersuasive and ignores the fact that the Indenture's defined term Credit Default Swap Agreement refers to the Ballyrock Master Agreement and does not directly embrace the Transactions contemplated by that agreement. Count II does not state a claim upon which relief can be granted because even if Ballyrock failed to observe the Indenture's requirements for termination of the Credit Default Swap Agreement (*i.e.* the Ballyrock Master Agreement), the Transactions themselves were terminated and termination of the Transactions by itself would be sufficient to establish a right to the termination payments at issue in the Adversary Proceeding.

*The Definition of Credit Default Swap Agreement*

LBSF expands the definition of the Credit Default Swap Agreement to include both the Ballyrock Master Agreement and all underlying Transactions. In opposing the motion to dismiss, LBSF provides the actual definition of Credit Default Swap Agreement from the Indenture and then offers its interpretation:

> The Indenture defines the Credit Default Swap Agreement in pertinent part as 'the ISDA Master Agreement (Multicurrency—Cross Border) (together with the schedule and any confirmations thereto) dated as of July 12, 2007,

---

[29] *Id.* LBSF also claims the September 16 Letter was a termination of the Credit Default Swap Agreement based on Ballyrock's subsequent letters that characterize the September 16 Letter as terminating both the Credit Default Swap Agreement and all underlying Transactions. *See* Lacy Decl. Exs. B, C. By its terms, however, the September 16 Letter only designates that day "as the Early Termination Date in respect of all Transactions under the Master Agreement" and makes no mention of the Credit Default Swap Agreement. The discrepancies between these communications are unimportant because the restrictions on terminating the Credit Default Swap Agreement are not applicable to the termination of the Transactions thereunder.

> between [Ballyrock] and [LBSF] under which the [parties] shall from time to time enter into Credit Default Swap Agreement Transactions . . . ' (Indenture at 19.) ***That is, the Transactions form a part of the Credit Default Swap Agreement, and the ISDA Master forms another part of it.*** Indeed, the ISDA Master Agreement did not become the 'Credit Default Swap Agreement' without the credit default swap Transactions.

LBSF's Resp. in Opp'n to Ballyrock's Mot. to Dismiss, dated July 21, 2009, ECF No. 37, at 13, n.9 (emphasis added). This argument conflates the Transactions with the Credit Default Swap Agreement and distorts the definition contained in the Indenture. By incorporating the Transactions into that definition, LBSF confuses and obscures the distinction between the Ballyrock Master Agreement and the Transactions that may be entered into pursuant to that agreement.[30]

The Transactions are not integral to the Credit Default Swap Agreement, but exist under that agreement.[31] Likewise, the inclusion of "any confirmations" does not incorporate the Transactions into the Credit Default Swap Agreement definition. The confirmations are not the Transactions themselves but rather "other confirming evidence … exchanged between the parties *confirming those Transactions*."[32]

---

[30] LBSF also argued that with discovery it could show that the parties or the market views the termination of all outstanding Transactions to be a *de facto* termination of the larger Credit Default Swap Agreement, and thus impermissible under section 7.8(a). Hearing Tr. 89:10-91:9. Because the language of the Indenture is not ambiguous, the Court can properly interpret the contract provisions that define the Credit Default Swap Agreement without resorting to extrinsic evidence. *See Roberts v. Consolidated R. Corp.*, 893 F.2d 21, 24 (2d Cir. 1989).

[31] *See* Fink Decl. Ex. A (Ballyrock Master Agreement) at 1 (prefatory clause) ([T]he parties "anticipate entering into one or more transactions (each a 'Transaction') that are or will be governed by this Master Agreement…").

[32] *Id.* (emphasis added); *see also* Fink Decl Ex. E (Confirmation for CDO Securities) (providing that "this Confirmation sets forth the terms applicable to separate and independent Transactions").

Section 7.8(a)(xi) of the Indenture further highlights the distinction between the Credit Default Swap Agreement and the Transactions. Under that section, Ballyrock was entitled to terminate the Credit Default Swap Agreement despite the existence of outstanding Transactions if it entered into a replacement that "satisfies the Rating Condition, and is a Form-Approved Credit Default Swap Agreement."[33] This replacement Form-Approved Credit Default Swap Agreement is defined as an "ISDA Master Agreement (Multicurrency—Cross Border) entered into by [Ballyrock] for the purpose of effecting credit default swaps [i.e. transactions] ..."[34] This ability to replace the "Credit Default Swap Agreement" while Transactions were outstanding serves to demonstrate that the Transactions are independent of the Credit Default Swap Agreement and have a separate existence. Because of this distinct status, termination of the Transactions was not subject to the restrictions for terminating the Credit Default Swap Agreement in section 7.8(a)(xi) of the Indenture.[35] The question remains whether Count II states claims with respect to ineffective early termination of the Transactions.

*The Termination of the Transactions*

The Ballyrock Master Agreement specifies procedures for the early termination of all outstanding Transactions following an Event of Default.[36] It provides, "[i]f at any

---

[33] Fink Decl. Ex. F (Indenture) § 7.8(a)(xi)(B)(1).

[34] Fink Decl. Ex. F (Indenture) § 1.1. The definition of "Form-Approved Credit Default Swap Agreement" expressly provides that the then-existing "Credit Default Swap Agreement shall be a Form-Approved Credit Default Swap Agreement," *i.e.*, an ISDA master agreement. *Id.* § 1.1.

[35] The count also alleges Ballyrock failed to meet certain conditions concerning the replacement of the Credit Default Swap Agreement upon termination under section 7.5(f) of the Indenture. Complaint ¶ 45. That provision deals with replacement of the Credit Default Swap Agreement and is not applicable to the termination of the Transactions and resulting termination payments.

[36] Fink Decl. Ex. A (Ballyrock Master Agreement) § 6(a).

time an Event of Default … has occurred and is then continuing, the [non-defaulting] party . . . may . . . designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions."[37]  Following LBHI's bankruptcy, Ballyrock sent LBSF the September 16 Letter, "designat[ing] September 16, 2008 as the Early Termination Date in respect of *all Transactions* under the Master Agreement."[38]  The Ballyrock Master Agreement also provides that upon the "effective designation of an Early Termination Date … [t]he amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e)."[39]  In this instance, the amount due is approximately $404 million in termination payments.[40]  As provided in the Indenture, these termination payments were then to be distributed in accordance with the Waterfall.[41]

The restrictions in the Indenture on termination of the Credit Default Swap Agreement are contractual provisions that do not extend to or limit the separate right to terminate the Transactions themselves.  Ballyrock complied with the provisions of the Ballyrock Master Agreement and did all that was necessary to designate an Early Termination Date, terminate all outstanding Transactions, and establish the obligation of the out-of-the-money party to pay the termination payment.  The Indenture's requirements for termination of the Credit Default Swap Agreement do not apply to termination of the Transactions.  Count II seeks to complicate an otherwise

---

[37] *Id.*

[38] Lacy Decl. Ex. A (September 16 Letter) at 1 (emphasis added).

[39] Fink Decl. Ex. A (Ballyrock Master Agreement) § 6(c).

[40] Complaint ¶ 20.

[41] Where these termination payments fall in the Waterfall is a subject to be determined in this litigation.

19

straightforward exercise by Ballyrock of its right to terminate the Transactions and fails to state a claim on which relief may be granted.

### *Conclusion*

The complex structure that is the subject of the Adversary Proceeding includes contractual provisions designed to reallocate the right to receive the value of the financial assets within this structure upon the occurrence of certain identified Events of Default. As explained in *Perpetual* and in this decision, commencement of a bankruptcy case under the Bankruptcy Code is an Event of Default that is imbued with policy considerations, and such an Event of Default may not be used to reallocate financial outcomes to the detriment of LBSF.

The Court concludes that the provisions governing the Defaulted Synthetic Termination Payment are susceptible to the interpretation that they function as an unenforceable *ipso facto* clause because they effectively eliminate the right to receive a termination payment due to commencement of the LBHI bankruptcy. Consequently, the motion to dismiss counts I and III of the Complaint is denied. These counts state causes of action based on legally sufficient allegations that the Proposed Distribution should be declared invalid. The motion to dismiss is granted as to Count II. The parties are directed to submit an order consistent with this decision and to schedule a pre-trial conference to be held during the June omnibus hearing.

Dated: New York, New York
    May 12, 2011

                                      *s/ James M. Peck*
                                      Honorable James M. Peck
                                      United States Bankruptcy Judge